RIGGS v. STANDARD OIL CO. (two cases).

(Circuit Court, D. Minnesota. April 22, 1904.)

**1. NEGLIGENCE—DANGEROUS ARTICLES—LIABILITY OF MANUFACTURER.**

A manufacturer who places on the market an article which is dangerous under the name of one which is not dangerous may be liable for an injury resulting to a purchaser from its use in the manner in which it is intended to be used, although such purchaser did not buy from the manufacturer, and there is no direct contractual relation between them.

**2. SAME—ACTS OF AGENTS—LIABILITY OF PRINCIPAL.**

One employed by a refining company to sell and distribute oil to customers, being paid by a commission on the amount of sales, is an agent or servant of the company, which is liable for acts of negligence in the conduct of the business on the part of the agent or others employed by him.

**3. SAME—ACTION FOR PERSONAL INJURY—QUESTION FOR JURY.**

There can be no recovery against a manufacturer of kerosene oil purchased by plaintiff from a dealer for an injury resulting to plaintiff from its explosion, claimed to have been due to its being mixed with gasoline, which reduced it below the legal standard of safety, where there is no direct evidence of such mixture, or whether, if there was, it occurred before or after the delivery of the oil by defendant to the dealer, and where the circumstantial evidence afforded no ground for determining such questions except by conjecture; and such evidence does not warrant the submission of the case to the jury.

**4. SAME—CONTRIBUTORY NEGLIGENCE—WHEN QUESTION FOR COURT.**

On an issue as to contributory negligence, if there is no dispute as to the facts and the circumstances surrounding the facts, it is the duty of the court to determine the issue as a matter of law, and to instruct the jury accordingly.

**5. SAME—POURING KEROSENE OIL FROM CAN ON LIVE COALS.**

Plaintiff poured kerosene oil from a can on wood and kindling in a stove in which she knew there were live coals, and there was an explosion of the can, resulting in her being seriously burned. *Held*, that she was chargeable with negligence which precluded her recovery for the injury from the manufacturer of the oil on the ground that it was below the legal standard of safety.

At Law. On motion by defendant for direction of a verdict after the closing of the evidence in behalf of both parties.

L. E. Utley, William A. Kerr, and E. F. Waite, for plaintiff.

Stringer & Seymour and Alfred D. Eddy, for defendant.

LOCHREN, District Judge (orally). The action that is brought by Mrs. Anna B. Riggs is to recover from the Standard Oil Company damages for the injuries which she sustained by reason of an explosion of oil used by her to light a fire on the 18th of June, 1903, upon the claim that the oil was a mixture of kerosene and gasoline, although purchased by her husband as kerosene oil; and that under the Minnesota statute, which prescribes a test for kerosene, and forbids the sale of any oil which will not stand that test, of not burning at any point below 120 degrees Fahrenheit, the Standard Oil Com-

¶ 1. Liabilities of manufacturers and venders of injurious substances for injuries to persons other than immediate vendees, see note to Standard Oil Co. v. Murray, 57 C. C. A. 5.

See Negligence, vol. 37, Cent. Dig. § 25.

pany was guilty of negligence in selling such dangerous oil, and re·
sponsible for the very grievous injuries which she sustained by reason
of being burned.

It is evident that the injuries are very severe, and, if there is evi-
dence to show that the Standard Oil Company is responsible for
these injuries, then it certainly ought to be required to make com-
pensation. On the other hand, if the evidence fails to establish such
claim, and if there is no evidence from which the jury can rightfully
find responsibility on the part of the Standard Oil Company, then it
would be unjust and improper to permit a verdict against the defend-
ant, notwithstanding the severity of the injury which the plaintiff has
sustained.

The case on the part of the husband depends upon that of the wife:
the injury which he has sustained being by reason of her injuries.

Counsel for defendant made a motion at the close of the plaintiff's
evidence that the jury be instructed to return a verdict for defend-
ant on the ground that there was no evidence which would support a
verdict on behalf of the plaintiff. It is claimed, in the first place, that
there was no contractual relation between the plaintiff and the de-
fendant; that the plaintiff did not buy oil of the defendant, and that,
therefore, the defendant is not responsible for what somebody else
sold. Ordinarily, that is true; but it is not true where a party puts
upon the market an article which is dangerous, under the name of
an article which is not dangerous, whereby a third party may be de-
ceived in purchasing it, although that third person does not buy di-
rectly of the one who puts it upon the market. This is a doctrine
which is applicable in the case where a harmful drug is sold under
the name of a drug that is innocuous, it being really poisonous and
dangerous; and where it is put up in the form in which it is sold,
not by the druggist, but by the manufacturer. In that case the per-
son who puts it upon the market in that form is liable to any person
who may be injured by the use of it in the manner in which it is ex-
pected to be used. In this case the evidence shows without contra-
diction that the oil that was furnished by the defendant, the Standard
Oil Company, at Monticello, during the spring and early part of the
summer of 1903, and until past the time of the sale of this oil, con-
sisted of three car tanks of oil, which had been inspected by the
deputy inspector of oils, and found to stand the test—one car being
of such a quality that the flashing point was 121 degrees, another
car 123, and the third, I think, 125 degrees; at any rate, it was all
above 120 degrees. There is also testimony without contradiction
that kerosene from these cars was transferred by pumping the same
into the storage tanks of the Standard Oil Company at Monticello,
and that the kerosene which was sold in that village and in the sur-
rounding villages by Mr. Crozier from some time in the early spring
until the time of this accident was taken from these storage tanks,
and was part of the oil that came out of these three cars, the quality
of which has been shown by uncontroverted evidence to be above the
required standard. The evidence shows that Mr. Crozier furnished
oil to Mealey & Co., and it is claimed here by defendant that it is
not liable, for the reason that, even if there were any fault in the oil

which was furnished to Mealey & Co. and the plaintiff, or if there was any mixing of the oils, it must have been done by the drivers employed by Mr. Crozier, who were not employés of the Standard Oil Company. Cases have been cited where it was held that the owner of a property or business is not responsible for the acts of the servants of an independent contractor that he may employ about his property or business. That is true. I think there is no doubt but that is the universal rule; but it does not strike me that the evidence as to Mr. Crozier makes a case of that nature. I think he was not in the position of an independent contractor. He was none the less the agent and servant of the Standard Oil Company because he was serving for a commission. The details of that contract are not explained, but it appears that his compensation depended upon the amount of oil that he disposed of. That would make him no less an agent or servant than if he were employed under a fixed salary; and the fact that he employed others to do the work which he had engaged to do for this commission would make the acts no less the acts of his principal than if he had done them himself, he not being an independent contractor, but simply an agent or servant himself. If he employed a co-servant to carry the oil or drive a tank wagon, I think it would be the same as if he had done it himself, and that it also would be an act of the defendant, or an act which would make the defendant responsible in case there was any negligence in performing it. There is not any direct evidence whatever of any mixing of oil by these teamsters. There is not any evidence from which it might be inferred that there was any mixing of oil by the teamsters, other than the evidence of Dr. Drew as to tests made by him upon the oil which was brought to him by Mr. Utley in a bottle. The testimony of the drivers themselves is to the effect that the oil which they delivered to Mealey & Co. was kerosene oil from this storage tank, which had already been tested by the deputy inspector. The testimony showed that Mealey & Co. did not deal in gasoline, and there is no testimony that they dealt in any other kind of petroleum oil than kerosene; but there is direct testimony that they did not deal in gasoline. Now, the only testimony from which it is claimed or could be inferred that this was kerosene mixed with gasoline, so as to be below the standard required by the Legislature, is, as I have said before, the test made by Dr. Drew of what was found in a lamp which had been broken, and which had lain out in a garbage box, as it is claimed, for some eight or nine months, out of doors. If there was anything in the oil that was used other than kerosene of the standard grade, there seems to be no direct evidence as to how it came there, or that it came there in any way for which the defendant is responsible. It could hardly be done by mistake, as the methods of getting gasoline into the tank wagon and of getting kerosene into it were so different that it could hardly happen that one of the fluids would be put in by mistake for the other. If the wagon tank had been filled with gasoline, and Mr. Mealey's tank filled from that, it would doubtless have made a disturbance in the town, of which there would have been heard more than this one explosion. The testimony with regard to that is that there was no complaint whatever as to the

kerosene that was sold by Mr. Mealey during these months by those who bought and used it. There was some testimony of an indefinite character as to some lady, whose name is not given, making some complaint, the substance of which is not stated, as to a gallon of kerosene which she bought of Mr. Mealey. One of the clerks testified that he smelled of it, and thought it smelled like gasoline somewhat, and he went and smelled of the tank, which smelled to him the same; but still he told the lady that it was all right, and sent her home with the kerosene; and neither he nor the other clerks whose attention was called to that lady's complaint considered it of sufficient importance to make any report of it either to Mr. Mealey or his partner. Then there is the testimony of Mr. Kries, the druggist, that about the 1st of June—some three weeks before this accident—he sold a gallon of gasoline to the plaintiff's child, who came for it, and that she paid for it and took it away, being at the time with another little girl. What was done with this gasoline, what it was bought for, or what use was made of it, does not appear. I do not know but that it is just as safe to conjecture that in some unexplainable way it got mixed with the kerosene that the plaintiff bought at Mealey's as that there was any gasoline mixed with it in any other way. The evidence is not at all satisfactory with regard to that. It is doubtful whether the jury ought to be allowed to conjecture, where there can be nothing else than conjecture, to determine whether there was gasoline mixed with this kerosene before plaintiff bought it, or as to how it became mixed, if there was any mixture.

The other question in the case is as to whether the plaintiff herself was not guilty of contributory negligence which should prevent any recovery. The rule of law in that respect is stated in many of the cases cited by counsel to the effect that, where there is negligence shown on the part of a defendant, which is a proximate cause of the injury sustained by the plaintiff, if at the same time the evidence shows that the plaintiff himself was guilty of negligence which also contributed to the injury, whether in a greater or less degree than the negligence of the defendant, there can be no recovery. The law will not undertake to separate or determine as to the responsibility in cases where there is concurring negligence of both plaintiff and defendant.

It is also claimed on the part of the defendant that, there being no dispute as to the facts upon which it is claimed this contributory negligence arises, as a matter of law it is the duty of the court to decide the question. If there be any question of fact in dispute respecting plaintiff's alleged negligence, or if there were any inference of fact arising from the testimony from which there might be a difference of opinion respecting such alleged negligence, then it would be a matter for the jury to decide; but if there is no dispute as to the facts and the circumstances surrounding the facts, then the court cannot escape the duty of passing upon the question and instructing the jury one way or the other, and as to whether those facts constitute negligence or do not constitute negligence. I do not remember any dispute as to the facts here. At any rate, in passing upon a question of this kind, I should and must take the statement of facts most fa-

vorable to the plaintiff. Taking her own testimony in respect to the matter in controversy, it appears that her husband came home to dinner about noon. Of course, she had a fire in the stove to cook his dinner. Some time later she put some more wood in the stove, heated water, and washed the dishes, and attended later to some other work, which she mentioned in her testimony. That at or about half past 5 o'clock in the afternoon, she, in order to get supper, commenced to build a fire. That she opened the cover on the west side of the fire box of the stove, and found there were coals in the stove. She mentioned that there were six or eight of them about the size of a hickory nut or a walnut. She states that she then pushed these coals to the east side of the firebox of the stove, where the cover was not open, got some light kindling wood which she split up and put into the firebox, and got some oak wood, and put in two or three sticks of the oak wood on the kindlings. Then she got the can of kerosene from behind the flour box, and came to the opening where the cover had been taken off on the west side of the firebox, and poured upon the wood, or commenced to pour, some oil from the can, and it exploded immediately, and filled the room with fire, which caught her clothes, and she ran out of doors. The only testimony with respect to the condition of the stove was the testimony of Mrs. McEachern and her father. It seems that Mrs. McEachern lived near by, and saw from her chamber window the plaintiff as she ran out of doors with her clothes on fire. She immediately ran down and caught up a rug on the way, and, the plaintiff having fallen down, she wrapped the rug around her to extinguish the flames, and returned, and sent the little girl to call a doctor; and while she was gone her father, the witness Mr. Stokes, came up and put out the fire by pouring water upon the plaintiff. Mrs. McEachern testifies that after coming back the second time to the house she went into the kitchen, and that she saw the skillet on the stove, in which the plaintiff stated she had put some potatoes, with some butter in it, to fry for supper, and that the skillet was sizzling at that time. The testimony of Mr. Stokes was that there was fire in the stove when he went there, and he got in there before Mrs. McEachern, his daughter. The only other testimony in connection with the stove is the testimony of Mrs. Hallett, which was to the effect that the fire was out, and that the skillet was cold, and also its contents; and that on the stove there was either water or kerosene.

It does not seem from these statements that there is any question about the facts, as far as they are material, or with reference to any inference that can be drawn from them. It is plain that the plaintiff found fire in the firebox—found live coals there; that she placed her kindling wood upon the coals in the firebox, with the other wood upon it, and poured this oil upon the wood, intending to light a fire, not being content to wait until the kindling wood had ignited from the coals; and that there was an explosion immediately. Now, of course, nobody will claim that there was anything in the nature of spontaneous combustion there, and it is plain that the explosion must have occurred by the contact of that oil with the fire that was in the stove. It is true that the legislative act requires that kerosene shall

stand a test of 120 degrees Fahrenheit before burning, which is construed by the inspectors as "before flashing," which is a higher test, as I understand the testimony. There is no doubt that, if any of this kerosene reached the coals, it would instantaneously very much exceed a temperature of 120 degrees. One hundred and twenty degrees is, as I understand, a moderate amount of heat. It would simply be a slightly warm fluid at 120 degrees, while a live coal of fire is of a distinctly higher temperature, and, if kerosene of the standard required by the statute would burn or even flash at 120 degrees, it would certainly, in contact with coals of fire, ignite, and it would form a gas instantaneously, which would ignite as instantaneously, and would pass back over the current of kerosene connected with it to the can. It would form gases as rapidly as it passed back, much as if it were a train of gunpowder that was being poured over a pan of fire. The fluid would be changed in that case into gas, and then into flame, almost instantaneously. It seems to me that this must necessarily have happened in this case, and that there was nothing else needed to cause the explosion except that fire and the pouring of kerosene upon it from the can.

Now, there has been testimony introduced from witnesses on the part of the defendant, or from the cross-examination of defendant's witnesses, that it is customary with some men to make fires with the use of kerosene by pouring it upon kindling to light the fires. It is very possible that this may be done with entire safety if there are no coals of fire in the stove; by putting the wood and kindling in the stove and pouring oil upon it, putting the oil can away, and then applying a match to it. It is very probable that there will be no explosion under such circumstances; or, if there be a flash, then there will be no can near to explode. But, if there is fire in the stove, it seems to me that this case demonstrates the fact that there is great probability of an explosion; and that the nature of petroleum oils of all kinds, including that of kerosene, is well known to be such, as a matter of common knowledge, that it is very dangerous to use them where they may come in contact with fire, and that when they come in contact with fire an explosion is very liable to occur.

It seems to me that I must hold, as a matter of law, that it is hazardous negligence to attempt to light a fire in a stove where there are either live coals or a blaze, by the use of kerosene oil even of the standard required by the statute.

I think the motion must be granted, and a verdict for defendant will be directed.