# WILLIAM C. SINCLAIR v. INVESTORS SYNDICATE.[1]

May 1, 1914.

Nos. 18,482—(70).

**Contract — questions for jury.**
> The trial court directed a verdict for defendant and subsequently granted a new trial on the ground that the case should have been submitted to the jury. Under the evidence it was a question for the jury whether the contract in controversy was made for and on behalf of defendant; and, if made on behalf of defendant, it was also a question for the jury whether the one so making it had apparent authority from defendant to do so; and, if made on behalf of defendant and under such apparent authority, it was likewise a question for the jury whether plaintiff entered into and performed it relying in good faith upon such authority.

Action in the district court for Hennepin county by William C. Sinclair, doing business as Sinclair Advertising Co., to recover $225. The case was tried before Steele, J., who when plaintiff rested granted defendant's motion for a directed verdict. From an order granting plaintiff's motion for a new trial, defendant appealed. Affirmed.

*Farnam & Tappan,* for appellant.

*John M. Rees,* for respondent.

[1] Reported in 146 N. W. 1109.

TAYLOR, C.

This action was brought to recover the amount of a bill for printing. At the close of plaintiff's case, on motion of defendant, the trial court directed a verdict for defendant; but afterwards, on motion of plaintiff, made an order granting a new trial, and this appeal is from that order. If the evidence made the question of defendant's liability a question for the jury, the new trial was properly granted.

The principal business of defendant is the issuance and sale of what it terms investment bonds. For several years it occupied a suite of office rooms in the Guaranty Loan Building in Minneapolis. B. E. McClain, its president, and J. W. Earl occupied desks in the same room. Upon its advertising circulars, Earl was designated as "Manager Bond Department," or as "Mgr. Bond Sales Dept." The bill in controversy is for preparing and printing 4,000 each of four different folders advertising its business and explaining the desirability of its "bonds" as investments. The negotiations for the work took place in the room occupied by Mr. McClain and Mr. Earl, and were conducted on one side by plaintiff and on the other side by Earl. After proof-sheets had been presented to and corrected by Earl as provided in the order hereinafter set forth, the first instalment of 8,000 folders was printed and delivered at defendant's office together with a bill therefor. Defendant sent out 3,800 of these folders through the mail, but returned the bill, about 10 days after receiving it, with a request that it be made to Earl instead of to the company. Pursuant thereto plaintiff presented a bill to Earl, who died a few weeks later without having paid it. In the meantime plaintiff had printed the remainder of the folders in accordance with the order but defendant refused to accept them. As Earl was dead all conversations between him and the plaintiff were excluded, at the trial, under the statute. Mr. McClain, the president of the company, saw plaintiff conferring with Earl, but testified that he heard no part of the conversation and did not know what matter they were discussing. He, however, examined the folders when they were received and before they were sent out through the mail. Earl gave plaintiff a written order under which the work was performed which is as follows:

## "CONTRACT.

"Date, Sept. 24, 1910.

"Sinclair Advertising Co., Minneapolis, Minn.

"We hereby authorize you to furnish us with the following advertising matter:

"'16000 folders in two colors (4000 each of 4 forms) as per dummies submitted you, and including the necessary return cards for each.

"For which we agree to pay the sum of $450.00 f. o. b. Minneapolis. Copy and proofs to be first submitted for our O. K. before printing, and delivery made as near October 10, 1910, as possible.

"Delivery to be made in two . . . . . . . . . . and to be billed and paid for in four monthly instalments of $112.50 each.

"Shipped by            Freight            Express

"It is understood that in the event of proofs not being returned promptly to enable the work being executed on time, we authorize you to go ahead with the printing and shipping without such proofs, you being responsible, of course, for any typographical errors.

(Signed) "J. W. Earl, Sales Manager,

"Per J. W. Earl."


There is nothing in the order itself except the plural pronouns, "we," "us" and "our," and the signature, "J. W. Earl, Sales Manager, per J. W. Earl," to indicate for whom the work was to be performed. In the absence of anything indicating the contrary, pronouns used as these are used would usually be taken as meaning the party executing the paper. But the "dummies" referred to in the order and furnished therewith, in connection with the use of these pronouns and the form of the signature, and the fact that the words, "J. W. Earl, Sales Manager," were affixed with a rubber stamp, leave it uncertain whether Earl gave the order officially or personally. Where a writing is ambiguous and indefinite and its meaning uncertain, the circumstances attending its execution, the subject-matter, the situation of the parties and the prior negotiations between them may be resorted to for the purpose of determining its proper meaning and construction. Sandretto v. Wahlsten, 124 Minn.

331, 144 N. W. 1089. Knowledge of the prior negotiations is apparently confined to plaintiff, and, as the statute bars his testimony as to conversations with a deceased person, what took place between himself and Earl cannot be proven. The folders made up and printed from the "dummies" purport to be issued by defendant, and set forth in detail the various reasons why its bonds are desirable as investments, and explain its method of doing business. The name of Mr. Earl is printed upon them as manager of the bond department the same as it had been printed upon the advertising matter issued by the company theretofore. The contract was made in the office of the company, for the benefit of the company, with one whom the company had labeled as manager of the department to which the contract pertained, and whether it was or was not made on behalf of the company, was, under the evidence, a question for the jury.

2. Mr. McClain, when called for cross-examination under the statute, testified, in effect, that Earl was merely selling the bonds of the company on commission, and had no authority to make contracts on behalf of the company; and defendant insists that the company is not bound by any contract which he may have made. There is no direct evidence that Earl was authorized to make contracts on behalf of the company, but the company allowed him to occupy a desk in its office, in the same room with its president, and apparently held him out to the public as one of its officials and the manager of its bond department. The contract was made with him in the office of the company, pertained to the business of its bond department, and the company made use of a considerable portion of the printing furnished under it. A corporation can act only through its agents. Defendant, by holding Earl out to the public as manager of its bond department, clothed him with apparent authority to transact business pertaining to that department. Peterson v. Mille Lacs Lumber Co. 51 Minn. 90, 52 N. W. 1082; Barton-Parker Mnfg. Co. v. Wilson, 96 Minn. 334, 104 N. W. 968, 19 Am. & Eng. Enc. (2d ed.) 707. The rule governing transactions with an agent, acting without authority in fact, but whom his principal has clothed with apparent authority, rests upon the doctrine of estoppel, and is stated in Columbia Mill Co. v. National Bank of Commerce, 52

Minn. 224, 53 N. W. 1061, as follows: "Where one has reasonably and in good faith been led to believe from the appearance of authority which a principal permits his agent to have, and because of such belief has in good faith dealt with the agent, the principal will not be allowed to deny the agency, to the prejudice of the one so dealing." The rule there announced has been repeatedly approved in subsequent cases.

Upon the evidence in the present case, it was for the jury to determine whether Earl had apparent authority to make the contract in controversy for and on behalf of defendant; and, if he had such apparent authority and in fact made the contract for and on behalf of defendant, it was also for the jury to determine whether plaintiff entered into and performed the contract relying in good faith upon such apparent authority. The complaint is sufficient to admit the evidence offered and received, and the order granting a new trial was correct and is affirmed.