## ANUND T. LINDSTROM v. MINNESOTA LIQUID FERTILIZER COMPANY.

119 N. W. (2d) 855.

February 8, 1963—No. 38,607.

486

*Erdall & Erdall* and *Earl Hacking*, for appellant.
*John J. Daly, Jr.*, for respondent.

MURPHY, JUSTICE.

Action for labor and materials furnished by plaintiff, Anund T. Lindstrom, to defendant, Minnesota Liquid Fertilizer Company, a Minnesota corporation. The jury returned a verdict in plaintiff's favor for $2,338.90, and defendant appeals from an order denying its motion for judgment notwithstanding the verdict or for a new trial.

The labor and material furnished by plaintiff were ordered by one Hurley Weaver, who represented to plaintiff that he was acting for defendant in the transactions. Defendant denies that he was its agent

or employee and contends that the evidence compelled a finding that his status was merely that of a lessee of defendant's plant and equipment, without authority to bind defendant in any way.

The court instructed the jury to determine whether defendant by its actions and course of conduct had made Weaver its ostensible agent so as to become bound for the labor and material which he had ordered from plaintiff on its behalf. In its instructions on this issue the court stated:

"* * * It is unnecessary to prove agency by direct evidence but it may be inferred from conduct or circumstances. Inferences and implications must be based upon facts for which the principal is responsible. * * *

"* * * The law says that if you gave someone else all the appearances of being your agent so that a third person looking at this one that comes up and says, 'Well, it's quite obvious that he is the agent of the other person,'—if you give him that appearance and he buys something then you are responsible for it. * * * the question here * * * is whether * * * Minnesota Liquid, by doing something * * * created an impression in the mind of a third person that Weaver had the power and had the authority to incur a debt for which Minnesota Liquid would be responsible.

"* * * what Weaver said to Lindstrom this is a fact that you should consider, but this, by itself, is not enough in order to hold Minnesota Liquid responsible. * * * you have * * * to find that Minnesota Liquid did something which a third person could interpret as being the appearances of authority. We don't care what the private arrangements were between Minnesota Liquid and Weaver, unless Lindstrom knew something about it and there is no particular evidence that he did."

Defendant is engaged in the sale and distribution of mixed liquid anhydrous ammonia fertilizer. Its home office at the time involved was in Minneapolis, and it has various branch plants throughout the state, one of which has been located at Farmington since 1954. The Farmington branch consists of an office building; a 30,000-pound steel storage tank adjacent to rail trackage; and smaller movable tanks

and equipment. Defendant's name, "Minnesota Liquid Fertilizer Co.," is painted on a large sign above the office building and on the steel storage tank in letters of substantial size and prominence, and is also painted on the small storage tanks and equipment.

On July 30, 1955, one Hurley Weaver was placed in charge of the Farmington branch. Under agreements with defendant covering the period from August 1, 1955, to August 1, 1958, he was authorized to use the plant building and equipment there and required to maintain the same at his own expense. The agreements included the following provisions:

"* * * Lessor will lease to Lessee for a term as outlined in Paragraph No. 22 hereof its bulk plant situated at Farmington suitable for the storage, handling and dispensing of Anhydrous Ammonia.

* * * * *

"* * * Lessee agrees at his own expense to maintain the bulk plant, the machinery and equipment in proper working order at all times * * * .

* * * * *

"* * * This is a bailment of the equipment and in using the equipment Lessee shall not be considered an agent or employee of Lessor.

* * * * *

"If at any time the Lessee has violated any of the provisions of this agreement * * * Lessor may * * * immediately terminate this agreement and * * * without court action * * * take immediate possession of the products delivered hereunder * * * and of all books, records and accounts maintained in connection therewith * * *.

* * * * *

"* * * Lessee must, in order that Lessor can adequately schedule its requirements, obtain a sales volume in the area which represents in Lessor's opinion a reasonable amount of the potential Anhydrous Ammonia business available. Should Lessee not attain such volume or should Lessee not carry on a business which in Lessor's opinion is proper, Lessor may terminate this agreement immediately * * *.

"* * * Lessor agrees to aggressively promote the sale of Anhydrous Ammonia in Lessee's area. Lessor further agrees to act as consultant in technical matters and to provide sales instruction and technical instruction at reasonable times. Lessee agrees to cooperate and comply with Lessor's sales program and policy.

* * * * *

"The Lessor will maintain a maintenance depot where the Lessee can secure valves and pipe and other bulk plant parts and service. The parts are to be charged to the Lessee at the Lessor's regular price. * * *

* * * * *

"Lessee shall daily assign to Lessor its Accounts Receivable * * * on a form furnished by Lessor.

"All receipts of cash, checks or receipts of any other form shall be deposited in the bank account of the Lessor."

Under the plan of operation between defendant and Weaver, liquid fertilizer was shipped to Farmington in rail tank cars consigned to Weaver for resale to farmers in the area. Weaver distributed this to customers in field tanks, using defendant's equipment and applicators in applying it in the fields. In this work he was assisted by Richard Aronson, whom he had employed. In addition to defendant's equipment, Weaver also used a pick-up truck and two tractors of his own in performing the work described. On this truck the name "Hurley Weaver" appeared above the name "Minnesota Liquid Fertilizer Co."

In dealing with customers, Weaver was authorized to fix the price of the fertilizer sold. Each month he was billed by defendant for the amount of fertilizer removed from the steel tank and sold to customers based upon a measurement scale on the tank. When he or Aronson collected from customers for fertilizer sold, they would deposit the amount collected in the First National Bank of Farmington in a checking account in defendant's name. Defendant withdrew from this account any money which was due it for the fertilizer or for any advances which it had made to Weaver during the month and then forwarded the remainder to Weaver so he could pay his accounts and withdraw any earnings due him therefrom.

Defendant's president visited the Farmington branch on various occasions while Weaver was operating it. During the summer months defendant's sales manager likewise visited it once every 2 weeks. Another official in charge of the sale of a "mixed liquid" fertilizer also visited it on one or two occasions. On such occasions they could observe defendant's name prominently displayed on the office building, the large storage tank, and the movable equipment, and could observe that nothing on such property or equipment referred to Weaver as a lessee or as an independent contractor. On brochures forwarded by defendant to prospective customers in the area, the location of the Farmington branch was set forth together with directions to "SEE YOUR AGRO-VITA LESSEE MANAGER." Defendant's name and Minneapolis address were likewise printed thereon.[1]

Since February 1956 plaintiff has operated a small blacksmith and welding shop at Farmington. On May 8, 1956, Weaver first contacted him and requested that he perform certain welding services and supply parts and material for certain of the equipment used in connection with applying fertilizer. At Weaver's request, plaintiff then opened a charge account, on the first sales ticket of which Weaver printed in pencil the name "Minn. Liq. Fert. Co. Farmington, Minn," as the customer to be charged for items ordered by Weaver. Thereafter, until July 1958, he ordered various items of labor and material for the operation of the Farmington branch and for the maintenance of various equipment of defendant which had been entrusted to his care. All of these items were required for the conduct of defendant's business in the Farmington area, and were on Weaver's instructions charged to its account. By July 17, 1958, the total charges against defendant on this account were $2,438.90, less $100 paid by Weaver in July 1956.

Plaintiff testified that at various times when Weaver came to plaintiff's shop he had observed defendant's name on the pick-up truck

---

[1]Defendant claims error in the court's refusal to admit a copy of these brochures in evidence. Had they been received, it would seem that they would compel a finding that in addition to being a lessee of defendant's Farmington branch Weaver was also its manager.

which Weaver then drove; that he had also observed defendant's name on the plant building and equipment at Farmington; that he had looked up defendant's credit and financial standing in Dun and Bradstreet; and that at all times he assumed, in accordance with Weaver's statements, that defendant was the customer for which such services and material were being furnished. He also testified that he had talked with Weaver about the account on numerous occasions during the years in which it was active and that at no time did Weaver indicate anything other than that defendant was responsible for and would pay the charges thereon; and that shortly after such conversations he (Weaver) would see to it that defendant paid it.

Plaintiff first submitted a written statement of the account to defendant on October 3, 1958. He testified that in 1957 he had traveled to Minneapolis to talk to defendant's president about it, but that when he arrived he found the latter absent and he did not speak to anyone else about the matter. On October 23, 1958, after receiving the statement from plaintiff, defendant's president wrote plaintiff stating that Weaver was not its employee but was operating as an independent contractor and that it had no record of work performed by plaintiff for the defendant and that accordingly the latter was not responsible for the charges.

Defendant's president testified that he knew nothing of Weaver's account with plaintiff; that in 1958 he had heard that Weaver was having financial difficulties and was delinquent in the payment of his debts in the Farmington area; that upon learning of this he wrote Weaver as follows:

"August 22, 1958

\*     \*     \*     \*     \*

"Under the present financial circumstances existing between you and your creditors in the Farmington area, it is necessary for us to confirm termination of our *plant manager* lease with you. Inasmuch as we are quite uncertain about your future plans, I suggest that you contact us on your return from California in order that we can discuss certain unfinished business and also explore the possibilities of future employment in our organization." (Italics supplied.)

At this time Weaver was indebted to Aronson in the sum of $4,500 for wages. The latter continued to collect from customers amounts due for the fertilizer which they had purchased and to deposit such collections in defendant's checking account at the First National Bank of Farmington. He did this without any written or oral instructions from defendant. Thereafter, defendant paid him approximately $3,000 of the amount due him for wages. Part of this payment was made up by transfer to Aronson of Weaver's pick-up truck, title to which had been acquired by defendant in some manner not disclosed. Subsequently, defendant retained Aronson to take over Weaver's position in the Farmington plant. Weaver left for California in November 1958, but on his return in the spring of 1961 he was employed by defendant in a different part of the state.

1. The agreement between defendant and Weaver, which included a lease of defendant's Farmington property and equipment to Weaver, would not foreclose a finding that the relationship of principal and agent existed as between them. Washel v. Tankar Gas, Inc. 211 Minn. 403, 2 N. W. (2d) 43; Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608; Angell v. White Eagle Oil & Refining Co. 169 Minn. 183, 210 N. W. 1004. In Washel v. Tankar Gas, Inc. *supra*, defendant leased a gasoline filling station to one Wilson who employed Washel to work in it. During his employment he was killed and his widow sought workmen's compensation from defendant. This court there stated (211 Minn. 405, 2 N. W. [2d] 44):

"* * * The written lease to Wilson consists of five pages of closely spaced typewriting. The lessee must procure from the lessor all products handled at the station. The lessee must daily report to the lessor all sales made. While the lessee is at liberty to cut prices to some extent, it must not sell for less than invoice. The lessor made a monthly check of the lessee's tank records. There is much in the lease indicating that the lessor was much interested in the business of the filling station leased, and to that end supervised, directed, and counseled the lessee. So far as the evidence goes, the lessor supervised the leased filling stations much the same as the six it operated itself.

\* \* \* the ultimate finding that Washel was the employe of Tankar Gas, Inc. at the time of his accidental death is based on that theory \* \* \* that Wilson was an agent or servant in charge of the filling station and not a lessee thereof, and therefore authorized to employ Washel for Tankar Gas, Inc. We think the following decisions sustain the finding that Washel was the employe of Tankar Gas, Inc. when he met death: Angell v. White Eagle O. & R. Co. 169 Minn. 183, 210 N. W. 1004; Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608. It makes little difference whether the agreement between the parties is in form of an agency contract or a lease."

2. The similarity of the agreement in Washel v. Tankar Gas, Inc. *supra,* and the agreement here is significant. Under the latter, Weaver undertook to use defendant's equipment solely for the sale of defendant's products under defendant's trade name, and to maintain a sales volume in the area, which, in defendant's opinion, would represent a reasonable amount of business. He was directed to promote the sale of defendant's products in cooperation with defendant and to use defendant's equipment in applying the products sold. He agreed to furnish defendant with copies of invoices covering all sales and of contracts with the customers and to deposit the proceeds of such sales in defendant's name in the local bank. Therein defendant agreed to promote the sales of its products in Weaver's area; to act as consultant with respect thereto; and to provide sales and technical instructions therein at all reasonable times. It reserved the right to conduct an advertising program in the area and required that Weaver furnish it with a mailing list of all of his prospective customers. Any provisions in the agreement constituting a limitation on Weaver's authority were certainly unknown to the public or to plaintiff.

Numerous decisions not only in workmen's compensation cases but in tort actions as well have held that agreements or situations similar to those described here are sufficient to sustain findings that a principal and agent relationship existed between parties involved therein. Washel v. Tankar Gas, Inc. *supra*; Estes v. Anderson Oil Co. 93 Ind. App. 365, 176 N. E. 560; Lynn v. Roberts, 257 Mich. 116, 241 N. W. 214; Coffman v. Shell Petroleum Corp. 228 Mo.

App. 727, 71 S. W. (2d) 97; Greene v. Spinning (Mo. App.) 48 S. W. (2d) 51; Gulf Refining Co. v. Rogers (Tex. Civ. App.) 57 S. W. (2d) 183; Gulf Refining Co. v. Brown (4 Cir.) 93 F. (2d) 870, 116 A. L. R. 449; Magnolia Petroleum Co. v. Johnson, 149 Ark. 553, 233 S. W. 680; Fischer v. Havelock, 134 Cal. App. 584, 25 P. (2d) 864; Riggs v. Standard Oil Co. (D. Minn.) 130 F. 199. Likewise, contractual provisions to the effect that a party to a contract shall not be considered as agent or employee of the other have repeatedly been held not to foreclose findings that nevertheless the former was the agent or employee of the latter. Thus, in Annotation, 116 A. L. R. 457, 461, the editor states:

"* * * commonly an oil company sought to be held responsible for the tort of a gasoline or oil distributor * * * will contend that such distributor, by the terms of the written contract ordinarily involved, is an 'independent contractor' for whose tort it is not responsible, and illustrative of the attitude often displayed by the courts with respect to such contentions is the statement in Cholat v. Phillips Petroleum Co. (1934) — Mo. App. —, 71 S. W. (2d) 799, * * * to the effect that substance, not form, is the essence of a contract, and it will not do to say that a man is an agent subject to the orders of his master in the control of the master's business and an independent contractor when liability attaches to acts done in the course of the business."

3. The evidence here adequately supports a finding that defendant, by its actions, had made Weaver its *actual* as well as its ostensible manager of the Farmington branch. In its advertising material distributed in the Farmington area prospective customers were requested to refer to the "local manager" and "Agro-Vita Lessee Manager" of defendant's Farmington branch. In its letter of August 22, 1958, it definitely revealed that Weaver was actually looked upon by defendant as the manager of the Farmington branch as well as lessee of certain of the physical assets thereof.

Further, at all times its corporate name was painted in large letters on the buildings, tanks, and equipment of this branch, with nothing thereon to indicate that Weaver was lessee of such business or operated it as an independent contractor. It is well settled that, in so far

as third parties are concerned, the relationship of principal and agent may be evidenced by acts on the part of the alleged principal or appearances of authority he permits another to have which lead to the belief that an agency has been created. Gardner v. Hermann, 116 Minn. 161, 133 N. W. 558; Sinclair v. Investors Syndicate, 125 Minn. 311, 146 N. W. 1109; Matthews & Co. Inc. v. Pehrson, 178 Minn. 618, 225 N. W. 921. It has been held that, where a party permits his name to be used on property or equipment which is placed under the control or direction of another and thus makes such other an ostensible agent, an agency by estoppel will result. Columbia Mill Co. v. National Bank of Commerce, 52 Minn. 224, 53 N. W. 1061; Sinclair v. Investors Syndicate, *supra*. In Restatement, Agency (2d) § 8, comments *a* and *b*, this principle is expressed and illustrated as follows:

"(*a*)    Apparent authority results from a manifestation by a person that another is his agent, the manifestation being made to a third person and not, as when authority is created, to the agent."

"(*b*)    The manifestation of the principal may be made directly to a third person, or may be made to the community, *by signs, by advertising,* by authorizing the agent to state that he is authorized, or by continuously employing the agent." (Italics supplied.)

In Manning v. The Leavitt Co. 90 N. H. 167, 5 A. (2d) 667, 122 A. L. R. 249, a department store leased a portion of the store to another for use as a beauty parlor and authorized the use of its name in advertisements of the tenant. Plaintiff who had sustained burns from an electrical apparatus while undergoing hair treatment in the beauty parlor sued the store owner for damages. She testified that she had patronized the beauty parlor because defendant had "always advertised very extensively * * * I thought it was a good store and I went in there." There, in holding the defendant might be liable, the court stated (90 N. H. 170, 5 A. [2d] 670):

"The evidence was sufficient to establish all of the necessary elements of an estoppel; (1) a representation made with the authority of the defendant that it conducted a beauty parlor, under such circum-

stances that the defendant could foresee that women might act upon it to their possible prejudice, thus imposing upon the defendant a duty to avoid the misapprehension, (2) a belief in the mind of the plaintiff that the fact was as thus misrepresented, and a submission to the care of the shop and its employees in reliance upon that belief, and (3) consequent prejudice to the plaintiff. * * *

\* \* \* \* \*

"* * * if the defendant wished to avoid the duty to act in reference to the situation thus apparently created, it should have refused to be a party to the misrepresentation and have taken steps reasonably calculated to remove misapprehension from the public mind."

In Annotation, 116 A. L. R. 457, 462, the editor comments as follows:

"* * * In addition, these agreements [between oil producing corporations and local distributors of their products] commonly provide * * * that the company's signs, trademarks, etc., shall be placed on the buildings, trucks, tank wagons, etc.; that the 'agent' and his employees shall not be deemed employees of the company, which shall not in any event be liable for the negligence of the 'agent' or his employees * * *,"

and cites numerous decisions holding that under such circumstances there may be a finding of ostensible agency as between the producer and its local distributor. As indicated above, to avoid liability in such situations the corporate producer may display its properties in such a way as "to remove misapprehension from the public's mind" as to the actual ownership of the local business involved.

4. The jury's finding that a principal and agent relationship existed between defendant and Weaver would render defendant liable for acts performed by Weaver within the scope of his apparent authority as plant manager. Any secret limitations placed thereon by defendant would not absolve it from liability to third persons such as plaintiff who dealt with Weaver as defendant's manager and who were unaware of any limitations upon his authority as such. Koivisto v. Bankers & Merchants Fire Ins. Co. 148 Minn. 255, 181 N.

W. 580; Watts v. Howard, 70 Minn. 122, 72 N. W. 840; see, Rausch v. Aronson, 211 Minn. 272, 1 N. W. (2d) 371. The authority of an agent is generally held to be coextensive with the property or business entrusted to his care. Koivisto v. Bankers & Merchants Fire Ins. Co. *supra*; Derrick v. The Drolson Co. Inc. 244 Minn. 144, 69 N. W. (2d) 124. In the case of a department or branch manager the authority ordinarily would extend to his purchases of material and employment of services for the preservation and upkeep of the property and the operation of the business.[2] Minneapolis Brg. Co. v. Yahnke, 148 Minn. 178, 181 N. W. 331; Malone v. Pathe Exch. Inc. 141 Minn. 339, 170 N. W. 215; Sinclair v. Investors Syndicate, *supra*.

---

[2]In other jurisdictions it has been held that a building construction foreman had authority to order material for a construction project, Stewart-McGehee Const. Co. v. Brewster, 176 Ark. 430, 3 S. W. (2d) 42; a local agent to authorize purchases of food by a foreman for a labor crew supplied by the principal, Campbell v. Oriental Trading Co. 58 Mont. 520, 193 P. 1112; a landlord's agent to purchase fertilizer for a tenant, Jolly v. Chattahoochee Fertilizer Co. 28 Ga. App. 194, 110 S. E. 639; a superintendent in charge of a pulpwood plant to purchase feed for horses used in its operation, Channell Brothers v. West Virginia Pulp & Paper Co. 77 W. Va. 494, 87 S. E. 876; a general manager to purchase for his principal's use such goods as his position and title reasonably imply, Buffalo Coal Creek Min. Co. v. Troendle, 30 Ky. L. 740, 99 S. W. 622; an assistant superintendent of two lumber companies to purchase a log loader, Benford Lbr. Mfg. Co. v. Knox (Tex. Civ. App.) 168 S. W. 32; a regional manager of a motor company to accept return of defective trucks manufactured by his principal, General Motors Truck Co. v. Texas Supply Co. (4 Cir.) 64 F. (2d) 527; a cooperative electric power company manager to purchase electrical supplies, Southern Elec. Corp. Inc. v. Ashley-Chicot Elec. Co-op. Inc. 220 Ark. 940, 251 S. W. (2d) 813; a manager of an oil company to purchase materials for the business, Dewey T. Ross Engineering Corp. v. Sonneman (Tex. Civ. App.) 159 S. W. (2d) 200; an agent listed as general manager on principal's letterheads to purchase machinery, A. S. Cameron Steam Pump Works v. Lubbock Light & Ice Co. (Tex. Civ. App.) 167 S. W. 256; and a sales agent of a motor company whose name was on his office door to purchase an elevator, C. & C. Elec. Motor Co. v. D. Frisbie & Co. 66 Conn. 67, 33 A. 604.

5. Under the principles and authorities referred to the evidence above described was more than adequate to establish that Weaver's actions in ordering the described work and material from plaintiff for the maintenance of defendant's property and equipment and the operation of its business in the Farmington area were within the scope of his real or apparent authority as plant manager of the Farmington branch. Plaintiff testified that he had observed defendant's name on the Farmington property and equipment and on the truck which Weaver used while transacting business with him; that he was aware that defendant was owner of such property and equipment; and that he had looked up its credit rating and knew that it had sufficient financial resources to justify credit for the services and material ordered for it by Weaver in furtherance of its business and in the repair, maintenance, and operation of its property and equipment.

Affirmed.

OTIS, JUSTICE (dissenting).

The majority opinion holds that there is sufficient evidence to justify a finding not only that there was an apparent relationship of principal and agent between Hurley Weaver and defendant but that there was an actual agency as well.

In support of its decision that the contract between Weaver and defendant created an agency rather than a lease, the majority relies on three Minnesota cases which deal with the status of persons claiming benefits under the Workmen's Compensation Act. The decision in Washel v. Tankar Gas, Inc. 211 Minn. 403, 2 N. W. (2d) 43, was based on a violation of what is now Minn. St. 176.205, subd. 1. The court there simply found that the lease agreement was an unlawful scheme to avoid responsibility under the Workmen's Compensation Act.

The agreement between Weaver and defendant not only characterizes the parties as lessor and lessee, but paragraph 5 removes all doubt as to their legal relationship by stating:

"BAILMENT: This is a bailment of the equipment and in using the equipment Lessee shall not be considered an agent or employee of Lessor."

No such language is mentioned in Washel v. Tankar Gas, Inc. *supra*; Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608; or Angell v. White Eagle Oil & Refining Co. 169 Minn. 183, 210 N. W. 1004. Absent some overriding public policy such as that which controlled these decisions, the relationship expressly created by the parties to the contract cannot be arbitrarily ignored unless third parties are misled to their prejudice.

The trial court itself in its instructions stated:

"* * * [T]here is little evidence of any direct authorization by Minnesota Liquid to Weaver to go out and contract this particular debt for them; * * * ."

The court told the jury that the basic question was one of apparent agency.

The only evidence which plaintiff claims supports an ostensible agency was the appearance of defendant's name on the equipment, buildings, and tanks from which Weaver secured the products he sold, and the name of defendant adjacent to that of Weaver on a truck he used. If we are to hold that a distributor is deemed to be an ostensible agent who may foist contractual liability on a wholesaler or supplier because the name of the product and the name of the company are publicly displayed on buildings and equipment used by the distributor, we will be extending the law of apparent agency beyond any decision which has been called to my attention.

Reduced to its simplest terms, we have before us an artisan who dealt exclusively with a local distributor and looked to him for payment without indicating any intention of creating a contractual relationship with anyone else until after more than 2 years had elapsed. Plaintiff made no attempt to advise defendant of the debt which was incurred by Weaver until it became obvious that Weaver was incapable of paying the obligation himself. Looking to defendant for recovery was quite patently an afterthought. Plaintiff testified with candor that he didn't know whether or not Weaver was ever employed by defendant and that there was nothing on the equipment to show that Weaver was an agent or employee of defendant, and added, "I just took his word for it." The only substantial evidence of agency

was Weaver's own statement to plaintiff, which cannot under any view of the law be given weight in determining whether there was an apparent agency binding on the defendant.

Under the rule of the majority opinion it is difficult to imagine how the defendant and others similarly situated can protect themselves from the unauthorized debts of their distributors except by refusing to have their trade names and the names of their products displayed on buildings, fixtures, and equipment used in connection with the businesses in which they are engaged. I would reverse.

MR. JUSTICE SHERAN, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.