ALBERT HOCKEMEYER, TRUSTEE FOR HEIRS OF ELSIE
HOCKEMEYER, v. HOMER BOYD POOLER.
MOTORS INSURANCE CORPORATION AND OTHERS,
THIRD-PARTY DEFENDANTS.

130 N. W. (2d) 367.

July 24, 1964—Nos. 38,904, 38,905, 38,936, 38,941.

*O. C. Adamson II* and *Carl W. S. Peltoniemi,* for appellants Goetz and Everson.

*Norman H. Nelson, Carroll, Cronan, Roth & Austin, Frank X. Cronan,* and *Walter S. Buehler,* for appellant Motors Insurance Corporation.

*Charles R. Kennedy* and *Don E. Kennedy,* for respondent defendant.

NELSON, JUSTICE.

This appeal arises out of a collision between an automobile in which decedent, Elsie Hockemeyer, was a passenger and an automobile owned and operated by defendant and third-party plaintiff, Homer Boyd Pooler. Plaintiff, Albert Hockemeyer, brought an action for death by wrongful act against Pooler, who admitted his negligence, and recovered a verdict of $25,000. In a third-party action Pooler demanded indemnity from Motors Insurance Corporation (hereinafter referred to as MIC), James Goetz and Ronald Everson, copartners doing business as Goetz-Everson Motors, and Goetz, individually. Pooler claimed that the third-party defendants had negligently failed to provide him with liability automobile insurance and also sought reformation of a policy issued him by MIC to provide such coverage.

The jury in a special verdict found that third-party defendants had been negligent in failing to provide liability insurance and the court, trying the issue of reformation, determined that issue in Pooler's favor also. These appeals are from orders denying third-party defendants' motions for judgment notwithstanding the verdict or a new trial and from the judgment entered against them jointly and severally.

The essential facts may be stated as follows: Goetz-Everson Motors is a partnership engaged in the business of selling new and used cars in Wadena, Minnesota. Both partners devote their full time to the business. The two partners and their office manager, Howard Walther, are licensed insurance agents and represent MIC, which limits its activities entirely, both in the State of Minnesota and nationally, to the writing of physical damage insurance on automobiles. MIC does not issue policies which provide bodily injury and property damage liability insurance, or any other coverage for which a specific premium charge is not made, and does not comply with any financial responsibility law. Neither the agency agreement nor the insurance licenses authorized Goetz, Everson, or Walther to write or accept applications for any type of automobile insurance except physical damage coverage.

Goetz and Everson apply for collision policies only in connection with their own selling of automobiles and they are permitted to add to the collision policies, comprehensive, glass breakage, fire, theft, and windstorm coverages—that is, full coverage as to physical damage to automobiles. If the partnership makes a sale on credit, the transaction is usually financed through General Motors Acceptance Corporation or local banks. A conditional sale contract is executed and discounted by whatever agency chooses to buy it from the seller. This method of financing is an essential element in the sale of automobiles and when employed a purchaser is required to furnish collision insurance. The purpose of collision and comprehensive insurance is to protect the buyer of the contract so that if the security is lost the contract will be paid, any part of the insurance over the balance due on the contract being paid to the buyer. Thus, both the purchaser and lender are protected.

The partners do not require purchasers to obtain the necessary physical damage insurance from them but will accept a policy written by any authorized insurance company. If a customer requests automobile liability insurance, he is advised that Goetz-Everson cannot make it available and he must obtain it elsewhere. None of the salesmen of the partnership attempt to sell automobile liability insurance.

If a sale is to be financed through General Motors Acceptance Corporation, a customer's statement is made up in order to determine the financial ability of the buyer. This also contains an application for physical damage insurance. After the sale is completed, the statement is sent to the Fargo office of MIC. The policy is issued at the Fargo office and forwarded to the partnership which, in turn, mails it to the customer within a week to 10 days. While the partnership cannot issue the policy, nevertheless the insurance is made effective as of the date of the purchase of the automobile.

Mr. Pooler, the defendant and third-party plaintiff, 31 years of age at the time of trial, had had an eighth-grade education and was employed at the Eagle Bend Produce Company. On July 3, 1958, he bought the 1957 Oldsmobile involved in the accident from the partnership, the fatal accident occurring December 6, 1958. On the day he purchased the car his wife and he came to the Goetz-Everson garage about 1:30 p. m. He talked to salesman Leland Schumaker about making a deal involving his 1954 Buick and drove the Oldsmobile on a trial run out into the country. Pooler said at the trial that it was difficult for him to remember all conversations had on the day of the purchase, but that he remembered those parts of them concerning the price of the car, the allowance for the Buick, the payments, and closing the deal. He testified that to the best of his recollection Schumaker asked him about his insurance, if he wanted $100 deductible, and that he said that he did not but wanted "full coverage"— that he had had 3 years' experience with $100 deductible and did not want any more of it. He testified that Schumaker said, "Okay." After talking further with Schumaker, Pooler then executed the necessary customer's statement and conditional sale contract. He said the papers were handed to him, spread out on the counter, where the sale had been discussed, and that no one read their contents to him. He remembers Schumaker's going over the figures with him relating to the payment schedules and the insurance requirements of the contract. He admits signing both the customer's statement and contract and taking his copies with him, but claims that he really did not read either, although he looked at the figures. He did not read a provision in the

contract, set forth in bold type, stating that no liability insurance was being furnished. He testified that he and his wife spent more than 2½ hours at Goetz-Everson Motors and that he was not rushed into making the deal. He did not recall talking to anyone but Schumaker concerning insurance.

He received the MIC insurance policy in the mail within 10 days, opened it to see what it was, and told his wife to put it away. He said he knew it was the policy on his car because he saw the name Motors Insurance Corporation on the face of the policy, but did not read it because he believed he had "full coverage."

There was printed at the top of the first page of the MIC policy in bold red type the following statement:

"This Policy DOES NOT PROVIDE bodily injury and property damage liability insurance or any other coverage for which a specific premium charge is not made, and does not comply with any Financial Responsibility Law."

The same statement in similar red type was printed at the top of the last page.

A statement in bold, black type appeared on the conditional sale contract, between the figures showing the cost of the insurance and the principal balance, which read as follows:

"THE INSURANCE CONTRACTED FOR IN CONNECTION WITH THIS RETAIL INSTALLMENT SALE DOES NOT PROVIDE FOR LIABILITY INSURANCE FOR BODILY INJURY AND PROPERTY DAMAGE."

Pooler insisted on cross-examination that he had not read the policy before the accident, but admitted that he knew and appreciated what liability insurance was, what collision insurance was, and what comprehensive coverage was. He also testified that at no time in their conversations did Schumaker say that he was obtaining liability insurance for Pooler; furthermore, that there was no discussion specifically directed to liability insurance nor any mention of any particular amount. He admits that he had no idea upon leaving that he had obtained such insurance in a specific amount. It is also clear that Pooler had the opportunity to read the sale contract before he signed it.

He admits that he carried only collision insurance on his 1954 Buick and drove it several months, knowing that he was driving without the protection of liability insurance. He said that for a while he had thought he had "full coverage" on the Buick but discovered when he obtained a second collision policy and checked it over that he had no liability insurance. He said that "we let it go for a while and then I went to see Mr. Johnson about insurance, and in the meantime we decided to trade the car off."

Mrs. Pooler testified that she had been present when Schumaker asked Pooler if he wanted $100 deductible and Pooler had said he did not want it. She did not remember much of the conversation and did not know whether or not her husband read the papers before he signed them. She remembered receiving the MIC policy by mail and said that she put it in a filing cabinet and paid no further attention to it. She said that she left everything up to her husband in connection with the trade. She also stated that she was aware that her husband had been driving the Buick without any liability insurance and that it was their own choice not to have liability insurance at the time.

Schumaker recalled making the automobile deal with Mr. Pooler and that insurance was discussed; that Pooler asked him for full coverage and Schumaker said that "we didn't sell it" and explained that they could not provide liability coverage; that the discussion then turned to $100 deductible and $50 deductible and Pooler then said he would take $50 deductible coverage. Schumaker further testified that Pooler was not told he had to buy insurance from Goetz-Everson Motors but was told that he would have to furnish physical damage or collision insurance and that the seller could provide collision, fire, and theft insurance on the car being sold. Schumaker also testified that in discussing the conditional sale contract with Pooler, he called his attention to the fact that liability insurance was not being contracted for.

While Pooler testified that he talked only to Schumaker, it appears from other testimony the customer's statement was handed by Schumaker to Howard Walther, the partnership office manager, who was a licensed insurance agent for MIC. Walther testified that he

asked Pooler if he wanted collision, fire, and theft insurance, which were explained to him, and whether Pooler wanted Goetz-Everson to provide it. Pooler said he did. Walther testified also that there was no mention of full coverage or of liability insurance in the discussion. Following their conversation the box in the customer's statement following the application for physical damage coverage was marked "yes." Pooler remembered signing that document and did not deny the conversation testified to by Walther.

Although Everson signed the conditional sale contract, neither partner saw or spoke to Pooler during the afternoon the transaction took place.

After the accident Pooler's contract was paid in full by MIC and he received the balance of $307.09. Since his car was a total loss, the policy was cancelled and he also received a $33 premium refund.

The court did not require Pooler to make an election of remedies against the third-party defendants and permitted him to pursue simultaneously a claim for negligence and a claim for reformation of the policy on the grounds of fraud or mistake. During the trial the court ruled that the parol evidence rule was inapplicable. It also permitted the discovery deposition of Schumaker as a former employee of appellants to be read to the jury while he was present, ready to testify.

The Todd County sheriff was permitted to testify that after the accident Pooler had said he was "fully covered by insurance." An insurance agent was permitted over objection of third-party defendants to state that in his opinion "full coverage" includes liability insurance, an opinion that the facts in this case do not support and the entire record refutes as without foundation. The case was submitted to the jury on the negligence theory, the jury being instructed that all persons have the legal obligation to avoid injury to others; that "full coverage" includes liability insurance; and that the jury could find the third-party defendants guilty of negligence if they agreed to provide Pooler with liability insurance and failed to do so. Interrogatories were submitted concerning the terms of the agreement and the failure to fur-

nish liability insurance. No interrogatory was submitted as to contributory negligence on the part of Pooler.

■ The record in this case clearly establishes that Goetz-Everson had authority on behalf of MIC only to solicit applications for automobile physical damage insurance. It does not sustain the finding of the lower court that the partnership or any employee thereof ever had any authority from MIC, actual or apparent, to solicit an application for liability insurance from Pooler or to sell such insurance to him. We think, after a careful reading of the record, that the evidence also conclusively establishes that no employee of Goetz-Everson had actual, implied, or apparent authority from the partnership to provide or attempt to provide Pooler with such insurance.

■ The record conclusively establishes that the MIC physical damage policy issued to Pooler was the insurance contract the parties intended to secure; that there was no evidence of fraud or mutual mistake; and that there was no evidence sufficient to warrant admission of parol evidence to justify reformation of the policy issued pursuant to the conditional sale contract to provide unlimited and unspecified liability coverage.

When certain facts admitted by Pooler and his wife are taken into account, nothing remains to support the "full coverage" theory on which the case was tried. From their testimony it is plain that prior to entering into the transaction with Goetz-Everson on July 3, 1958, they had driven the 1954 Buick without liability insurance thereon and with full knowledge that they did not have it. Pooler conceded that he knew and understood the meaning of and the difference between liability, collision, and comprehensive insurance, and that he had made the decision to drive the Buick without carrying liability insurance because he expected to make the trade which took place when he purchased the Oldsmobile. We are bound to conclude that in view of his knowledge and experience plaintiff's retention of the MIC policy and the related conditional sale contract for more than 5 months, without complaint and allegedly without looking at the notice thereon which stated that the policy did not provide liability insurance, constituted such negligence and laches as to vitiate his claims

of alleged mutual mistake, fraud, and negligence. Clearly, the lower court's finding that Pooler himself was not so negligent in the premises as to require denial of reformation constitutes an abuse of discretion warranting reversal of the judgment entered.

The legislature of this state, by L. 1957, c. 266, § 6(c), enacted Minn. St. 168.71(c), which provides as follows:

"Every retail seller or sales finance company, if a charge for insurance on the motor vehicle is included in a retail installment contract shall within 30 days after execution of the retail installment contract send or cause to be sent to the retail buyer a policy or policies or certificate of insurance, which insurance shall be written by a company authorized to do business in this state, clearly setting forth the amount of the premium, the kind or kinds of insurance and the scope of the coverage and all the terms, exceptions, limitations, restrictions and conditions of the contract or contracts of the insurance. The buyer of a motor vehicle under a retail installment contract shall have the privilege of purchasing such insurance from an agent or broker of his own selection and selecting an insurance company mutually acceptable to the seller and the buyer; provided, however, that the inclusion of the cost of the insurance premium in the retail installment contract when the buyer selects the agent, broker or company, shall be optional with the seller."

Pooler received a copy of the conditional sale contract the day it was made and received a copy of the insurance policy within the period required by the foregoing statute. He signed at least three copies of the conditional sale contract, his signature in each case being written in the space provided therefor on the face of the contract at a point 3 inches below the bold-face, 3-line notice stating that the insurance contracted for contained no provision for liability coverage.

The collision policy forwarded to Pooler contained the notice described earlier at the top of the first page and, in even larger red type, on the back of the policy.

Since third-party defendants had fully complied with the provisions of § 168.71(c) the court below would have been justified in holding

as a matter of law no negligence had been established upon the evidence submitted. No one disputes that Pooler retained both the conditional sale contract and the MIC policy from July through December without any complaint about the policy's limitation to collision insurance. The record is also clear that after the accident he settled his claim for the total loss of his car with the MIC adjuster without making complaint that he had been misled by anyone.

In the face of this proof, which is uncontradicted, any later claim by Pooler that he "thought" he ordered and expected "full coverage" including liability insurance—not just full coverage in collision insurance—must bear the label of a patent afterthought. On the facts disclosed by the record no basis exists in the law for attributing any possible fraud to Goetz-Everson or to MIC for Pooler's own failure to secure liability insurance on the automobile he purchased July 3, 1958. The failure to obtain liability coverage appears to be simply a repetition of the choice he had made not to carry liability insurance when he drove the 1954 Buick.

In a New Jersey case, Mesce v. Automobile Assn. of New Jersey, 8 N. J. Super. 130, 73 A. (2d) 586, the plaintiff claimed that an agent for the auto club had told him he would immediately have comprehensive coverage on his automobile by virtue of signing an application and paying a deposit on such insurance. The application, however, contained a conspicuous notice stating, "This application is not a binder." Plaintiff claimed he did not read the warning and that he did not receive a letter from the club advising that until his application was investigated the application was not binding. The application was received January 7, 1949, and the auto club immediately initiated a retail-credit check of plaintiff. On January 13 plaintiff was involved in an accident, and on the same date the club wrote plaintiff forwarding a refund of his deposit and advising him that the club "was unable to place this policy." Plaintiff's suit, charging fraud and deceit, resulted in a judgment in his favor. The appellate court reversed and made the following observations about plaintiff's failure to notice the warning (8 N. J. Super. 136, 73 A. [2d] 588):

"* * * yet where no active wrongdoing is attributed to the principal

and the action is constructed upon the fraud of an agent who was not instructed or actually or impliedly authorized to commit it, there can be no recovery by a plaintiff who could have readily protected himself by opening his eyes and at once observing on the face of the paper which he signed the falsity of the agent's representation."

The court held plaintiff bound by his failure to read the conspicuous notice on the application, saying (8 N. J. Super. 138, 73 A. [2d] 590):

"* * * Here the fraud of the agent consists in his false representation of authority which the Association had in an exceedingly pragmatical manner informed the public he did not possess. In such a situation, to visit liability upon the principal because the plaintiff failed to acquaint himself with the statements conspicuously printed on the application form submitted to him, would introduce into the law a thin and precarious principle."

See, Rein v. New York Life Ins. Co. 210 Minn. 435, 299 N. W. 385, wherein this court held as a matter of law that certain acts were insufficient to clothe an agent with apparent authority to waive the terms of a written insurance contract.

It is clear that acts not within the actual or implied authority of the licensed insurance agents of MIC would be binding on it only if the proof established apparent authority. This requires the presence of the following elements: The principal must have held the agent out as having authority, or must have knowingly permitted the agent to act on its behalf; furthermore, the party dealing with the agent must have actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf; and the proof of the agent's apparent authority must be found in the conduct of the principal, not the agent.

We see nothing in the record to indicate that MIC granted to its agents apparent authority to solicit or write public liability insurance by reason of its grant to them of express authority to solicit only physical damage insurance and nothing else. The necessary elements to establish such apparent authority are not to be found in this record.

See, Dispatch Printing Co. v. National Bank of Commerce, 109 Minn. 440, 124 N. W. 236, 50 L. R. A. (N. S.) 74; Dispatch Printing Co. v. National Bank of Commerce, 115 Minn. 157, 132 N. W. 2; Cauger v. Gray Motor Co. 173 Minn. 370, 217 N. W. 347; Mooney v. Jones, 238 Minn. 1, 54 N. W. (2d) 763.

The effect of the decision reached below is to hold that the mere fact that agents of MIC were authorized to solicit applications for automobile physical damage insurance, only, nevertheless might clothe them with apparent authority to write public liability insurance, something their principal could not do. Moreover, according to the record before us, the Poolers never saw or talked to either partner when they entered into the transaction with Goetz-Everson Motors and never discussed liability insurance with Walther, the only authorized and licensed insurance agent present at the time. Their employee, Schumaker, was not a licensed insurance agent and there is nothing in the record to indicate he was ever held out as such.

■ The jury found that MIC, acting through its insurance agent, had negligently failed to provide liability insurance allegedly agreed upon between Pooler and Schumaker even though the latter was not an insurance agent and did not purport to act in that capacity but turned the Poolers over to Mr. Walther. Certainly under these circumstances an independent cause of action in tort will not lie in this case. We have said that the conception of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as between parties negotiating other contracts and, as such, is purely contractual. See, Schliep v. Commercial Cas. Ins. Co. 191 Minn. 479, 254 N. W. 618; Tjepkes v. State Farmers Mutual Ins. Co. 193 Minn. 505, 259 N. W. 2.

6-7. Clearly the alleged negligence of the agents of the third-party defendants occurred outside the scope of their employment if it occurred at all—which is not established by the proof—and thus could not result in any liability to either under the circumstances related herein. As has been heretofore stated in Slater v. Advance Thresher Co. 97 Minn. 305, 308, 107 N. W. 133, 134, 5 L. R. A. (N. S.) 598, 600:

"* * * But a master is not liable for every wrong which the servant may commit during the continuance of the employment. The liability can only occur when that which is done is within the real or apparent scope of the master's business. Beyond the scope of his employment the servant is as much a stranger to his master as any third person."

The agency agreement in evidence between MIC and Goetz-Everson Motors shows that MIC authorized Goetz-Everson only—

"* * * to receive and forward applications for insurance on motor vehicles;—

"1. Where the address of the applicant for insurance is located in the State of Minnesota and where the motor vehicle will be garaged principally in the State of Minnesota;—

"2. For the following types of coverage as written in the Company's standard forms of automobile insurance policies;—

"(a) Fire, Lightning and Transportation (b) Theft, Robbery and Pilferage (c) Tornado and Flood (d) Additional Coverage (e) Comprehensive Coverage (f) Collision and Upset."

These clearly defined powers made Goetz and Everson merely soliciting agents for MIC "to receive and forward applications" only for motor vehicle physical damage insurance, and they were neither soliciting agents nor general agents with power to sell or write automobile liability insurance on behalf of MIC. Furthermore, MIC does not write liability insurance either in this state or nationally. The testimony of Goetz, Everson, and Walther, the only licensed insurance agents connected with the Goetz-Everson partnership, is clear and uncontradicted that they were expressly authorized and licensed to solicit on behalf of MIC applications solely for motor vehicle physical damage insurance and that none had ever sold or been authorized or licensed to sell automobile liability insurance. Furthermore, there is no evidence in the record of apparent authority by any holding-out to Pooler by MIC, Goetz-Everson Motors, Walther, or the car salesman, Schumaker, that MIC was authorized to write automobile liability insurance.

Furthermore, the record discloses that Pooler was told by Schu-

maker that only physical damage and not liability insurance was being provided in connection with his purchase of the Oldsmobile and that there was no discussion of liability insurance with respect to specified companies or amounts. Pooler knew or should have known when he signed the various documents and applied for insurance that he was only being furnished collision insurance and that liability insurance was not obtainable from any third-party defendant. On the state of the record there was no basis in fact or in law for the lower court to have submitted to the jury interrogatories (all answered in the affirmative) concerning whether third-party defendants agreed to provide Pooler "full coverage"; whether they were guilty of negligence in failing to provide him with liability insurance; whether that failure, if negligent, was a proximate cause of Pooler's liability to the heirs of Mrs. Hockemeyer; and whether third-party defendants had reasonably led Pooler to believe he would have "full coverage" insurance.

The principles of the law of agency applicable in the instant case were aptly stated by Mr. Justice Mitchell in the case of Burchard v. Hull, 71 Minn. 430, 435, 74 N. W. 163, 164, as follows:

"It is axiomatic in the law of agency that no one can become the agent of another except by the will of the principal, either express or implied from the particular circumstances; that *an agent cannot create in himself an authority to do a particular act merely by its performance.* It is equally axiomatic that the extent of the authority of an agent also depends upon the will of the principal, and that the latter will be bound by the acts of the former only to the extent of the authority, actual or apparent, which he has conferred upon the agent." (Italics supplied.)

The agent's actual authority consists of express and implied authority. Express authority is that authority which the principal directly grants to the agent. Implied authority includes only those powers which are essential to carry out the duties expressly delegated. The agent's authority cannot be greater than the authority of the principal. See, Restatement, Agency (2 ed.) § 7, comment *a,* wherein it is stated:

"* * * There is no authority unless there is power to affect the legal relations of the principal. *Thus there is no authority unless the principal has capacity to enter into the legal relation sought to be created by the agent.*" (Italics supplied.)

Clearly then, an insurance agent's actual authority (as distinguished from apparent authority in excess thereof) to solicit applications for or, if a general agent, to write insurance does not extend beyond the scope of his principal's authorized line of business. See, 29 Am. Jur., Insurance, § 193. It is clear that a grant of actual authority to an agent to solicit or write public liability insurance for MIC would be no grant at all since MIC was not qualified to write liability insurance in Minnesota or elsewhere. MIC never purported to grant to any of its agents authority to solicit liability insurance on behalf of MIC or any other company and none of the agents here involved was licensed to solicit liability insurance or held himself out as an agent soliciting liability insurance coverage.

The evidence conclusively establishes that Goetz-Everson had authority only to solicit applications for motor vehicle physical damage insurance and does not sustain the findings of the lower court that Goetz-Everson or any employee of Goetz-Everson ever had authority from MIC, actual or apparent, to solicit an application from Pooler for, or to sell to him, automobile liability insurance in any form.

■ This court has repeatedly held that to reform a written contract or agreement mere preponderance of the testimony is not sufficient. The facts upon which he who seeks such reformation relies must be established by competent evidence, which is consistent and not contradictory, clear and not equivocal, convincing and not doubtful.

This court in Fritz v. Fritz, 94 Minn. 264, 266, 102 N. W. 705, 706, said:

"* * * Such relief will be extended to those only who have not by their own conduct (as laches, negligence, or otherwise) put themselves in such a position as to render it unjust to change the situation, especially when such change might injuriously affect the rights or status of innocent third parties."

See, Farmers Store v. Delaware Farmers Mutual Fire Ins. Co. 240 Minn. 170, 59 N. W. (2d) 889; Glaser v. Alexander, 247 Minn. 130, 76 N. W. (2d) 682; 29 Am. Jur., Insurance, § 354. See, generally, 5 Williston, Contracts (Rev. ed.) § 1548; Restatement, Contracts, §§ 491, 504; Prosser, *The Making of a Contract of Insurance in Minnesota,* 17 Minn. L. Rev. 567, 591; 13 Appleman, Insurance Law and Practice, § 7609; 29 Am. Jur., Insurance, §§ 338 to 342.

■ There is no support in the record for the emphasis placed by the court below upon the words "full coverage," which Pooler used in his conversation with Schumaker concerning $100 deductible collision insurance. The phrase cannot conceivably have any connection with liability insurance in view of the testimony of both Pooler and his wife and the other circumstances disclosed by the record. There is no evidence to establish mutual mistake or fraudulent misrepresentation going to the inception or the completion of the contracts here involved and therefore no basis for application of any exception to the parol evidence rule. See, Rosenquist v. Baker, 227 Minn. 217, 35 N. W. (2d) 346; McElrath v. Electric Inv. Co. 114 Minn. 358, 131 N. W. 380; Nelson v. Berkner, 139 Minn. 301, 166 N. W. 347. That being so, parol evidence is inadmissible to contradict or vary the terms of valid written instruments, one an insurance contract wholly free from ambiguity. There is nothing in the evidence which justifies any departure from the rule that the law "gives the character of conclusiveness to written instruments deliberately adopted by the parties as embodying their final agreements" and that "as to the terms, conditions, and limitations thereof the written contracts must speak for themselves." 7 Dunnell, Dig. (3 ed.) § 3368.

■ It is conceded by MIC that in the circumstances of the usual case the mere failure of an insured to read the terms and conditions of his insurance policy is not such negligence as will prevent relief in reformation, this court having adopted the rule that the insured's negligence and laches are "questions which make the propriety of granting relief in a given case discretionary." Norman v. Kelso Farmers Mutual Fire Ins. Co. 114 Minn. 49, 52, 130 N. W. 13. Whatever the reasonable standard for this rule of discretion may be, it is not

applicable to the facts involved in the instant case. The Norman case and Mosiman v. Rapacz, 250 Minn. 464, 84 N. W. (2d) 898, in which it was applied, are distinguishable on the facts and are not controlling here. It would seem reasonable to impute to the policyholder here, in view of our statute requiring that a copy of the policy be given to him upon issuance, such knowledge as would come to a reasonably intelligent person from a reading of his contract, especially where, as here, notices on the policy in bold, red type made it plain that liability coverage was not provided. See, Bauman v. Royal Ind. Co. 36 N. J. 12, 174 A. (2d) 585, 91 A. L. R. (2d) 535; Heake v. Atlantic Cas. Ins. Co. 29 N. J. Super. 242, 102 A. (2d) 385.

Upon the record as a whole it is clear that the trial court erred in finding that Pooler was not so negligent in the premises as to require a denial of reformation of the contracts involved and in failing to direct a verdict in favor of the third-party defendants, which was clearly warranted and required at the close of proof since the evidence so overwhelmingly preponderates in their favor as to leave no doubt as to the factual truth. See, Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243, and cased cited therein.

Reversed and remanded with directions to enter judgment in favor of third-party defendants.

Rogosheske, Justice (concurring specially)
I concur in the result.