R. Edwin POWELL, et al., Respondents,

v.

MVE HOLDINGS, INC., et al., Appellants,

MVE Investors, LLC., et al., Defendants.

No. C4–00–1379.

Court of Appeals of Minnesota.

May 15, 2001.

---

452

James H. Kaster, Nicholas G. May, Diane M. Odeen, Nichols, Kaster & Anderson, and Eric J. Magnuson, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, MN; and Paul J. Rogosheske, Thuet, Pugh, Rogosheske & Atkins, Ltd., South St. Paul, MN, (for respondents).

Robert L. DeMay, Daniel Oberdorfer, Leonard, Street & Deinard, P.A., Minneapolis, MN; and Gerald Walpin, Rosenman & Colin, LLP, New York, NY, (for appellants).

Considered and decided by G. BARRY ANDERSON, Presiding Judge, LANSING and RANDALL, Judges.

## OPINION

LANSING, Judge

MVE Holdings, Inc. (Holdings), appeals from judgment and denial of its new-trial

motion in a breach-of-contract action brought by R. Edwin Powell, its former employee and shareholder. The district court found that Holdings contracted to redeem Powell's stock and then breached that contract. Holdings appeals, claiming that it did not agree to redeem Powell's stock; that its president and CEO did not have authority to make such an agreement; and that any agreement was not the parties' final expression but rather evidence of negotiation, is void for lack of consideration, and is against public policy. We conclude that the evidence supports the district court's findings and affirm.

## FACTS

From 1993 until January 23, 1997, R. Edwin Powell was CEO and president of CAIRE, Inc., a Delaware company based in Burnsville, Minnesota. CAIRE manufactures home health-care products, including portable oxygen tanks. Powell had worked for CAIRE, a subsidiary of Holdings, for the preceding 13 years as an at-will employee. In addition, Powell and the Powell Family Limited Partnership were minority shareholders in Holdings, owning 63,747 shares or 11.9% of the company. Trial testimony established that Powell paid $114,000 to $344,000 for the stock during his employment.

In 1996, a group of investors decided to acquire Holdings and CAIRE. They formed MVE Investors, LLC (Investors), a Delaware limited-liability company with its principal place of business in New York. Investors, organized solely to acquire a majority interest in Holdings, purchased the shares of three retiring Holdings shareholders in June 1996 as part of a recapitalization of the company. Investors paid the retiring shareholders $125.456 per share, investing $47 million in Holdings to become its primary owner.

Powell declined Investors' offer to sell his stock and retire with the shareholders who had accepted Investors' offer. Powell continued as CAIRE's CEO and president. To compensate Powell for losing his chance to sell his shares in the recapitalization, Holdings loaned Powell $1.5 million secured by 24,793 of Powell's shares of Holdings' common stock. Holdings called the loan in January 1998; at the time, an independent company valued the shares at $5.37 per share.

In response to CAIRE's financial setbacks, David O'Halloran, Holdings' CEO and president, met with Powell on January 23, 1997, to fire Powell. O'Halloran gave Powell the option to resign in lieu of termination, and Powell chose to resign, writing a resignation letter on January 28, 1997.

The critical factual issues in this litigation revolve around O'Halloran and Powell's January 23, 1997, meeting. The two men sharply disagree on the severance package O'Halloran offered Powell on behalf of Holdings at the meeting, the terms of which were to be included in a "separation agreement." Both men agree that O'Halloran offered Powell six months' salary and an additional six months' salary if Powell was not re-employed within the six months immediately following his departure. They also agree that O'Halloran offered Powell $30,000 in out-placement services, a continuation of Powell's health insurance and other benefits for a year, and a cash bonus if Powell was successful in lobbying Congress for particular legislation.

But the two men disagree on the terms for the disposition of Powell's stock. Powell testified that O'Halloran agreed, on behalf of Holdings, to buy Powell's stock at the same price that the retiring shareholders had been paid at the recapitalization that occurred in August 1996. According to Powell, O'Halloran told Powell that

Holdings would be able to buy the shares within a few weeks and would buy them no later than August 1997.

O'Halloran maintains that he did not promise Powell that Holdings would buy Powell's stock. But O'Halloran concedes that at the meeting, he gave Powell a detailed chart showing the number of shares Powell owned on January 23, 1997, and how much money Powell would receive if those shares were sold or redeemed at a price of $125.456, the same price the retiring shareholders had received. O'Halloran also testified that he wrote a letter terminating Powell's employment if he chose not to resign. In the letter, O'Halloran expressed Holdings' intent to buy Powell's stock in the same manner as it had bought the retiring shareholders' stock.

After his termination, Powell continued to attend trade-association meetings and to lobby Congress on Holdings' behalf until April 1997. Holdings and Powell continued to discuss Powell's separation agreement until April 1997, when O'Halloran informed Powell in writing that Holdings would no longer reimburse Powell for any expenses he incurred on behalf of Holdings. Also, Powell testified that O'Halloran called Powell in April to tell him that O'Halloran had lost board support for the stock redemption and that the deal was off.

Holdings fired O'Halloran from his position as CEO and president of Holdings in August. As part of the separation agreement that followed O'Halloran's discharge, he agreed to represent that he did not "make any statements or provide any writings that [he] in good faith believe[d] could reasonably be construed to constitute any agreement, oral or written, concerning the payment of severance or similar payments to, or the redemption or other disposition of capital stock of, R. Edwin Powell."

Powell brought this action against Holdings in October 1997, claiming, among other things, that Holdings had contracted to buy back his shares and then breached that contract. Chart Industries merged with Holdings in February 1999, paying $78 million for Holdings' stock. The merger agreement specified that shareholders who released claims against Holdings would receive $45 per share, but shareholders refusing to release claims against Holdings would receive only $25 per share. Powell refused to drop his lawsuit, and Holdings redeemed his shares at $25 per share, paying him a total of about $860,000 and retaining about $680,000 for defense costs associated with Powell's lawsuit. Powell also received shares of stock in a Holdings subsidiary as a result of the merger.

Following a nine-day bench trial, the district court found that Holdings had contracted to buy Powell's stock and breached the contract. The district court awarded Powell $3,455,887.20, the amount that Powell would have received had he sold his non-pledged stock for $125.456 per share, less $860,050 Powell received for his shares after the Chart merger, and also ordered Powell to transfer to Holdings the Holdings subsidiary shares he had acquired in the Chart merger. Both parties brought posttrial motions for amended findings and a new trial. The court amended its findings, but denied the new-trial motions. Holdings appeals, claiming that O'Halloran did not have authority to agree on its behalf to buy Powell's stock; that the district court's finding that O'Halloran and Powell entered into a contract is contrary to the evidence; and that any agreement was not the parties' final expression, is void for lack of consideration, and is against public policy.

## ISSUES

I. Did the district court err in finding that O'Halloran had apparent author-

ity to act for Holdings in entering into a stock-redemption agreement with Powell?

II. Did the district court err in finding that the evidence established a stock-redemption agreement between O'Halloran and Powell?

III. Is the agreement between O'Halloran and Powell invalid because it is not a final written agreement, lacks consideration, or is in violation of public policy?

IV. Is Holdings entitled to a new trial because the district court's findings are manifestly contrary to the weight of the evidence?

## ANALYSIS

■■■■ In a case tried without a jury, the scope of review is limited to determining whether the district court's findings are clearly erroneous and whether the court erred as a matter of law. *Schweich v. Ziegler,* 463 N.W.2d 722, 729 (Minn. 1990). The district court's findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. On appeal, the district court's findings will be reversed only if the "reviewing court is left with a definite and firm conviction" that the district court has made a mistake. *Gjovik v. Strope,* 401 N.W.2d 664, 667 (Minn.1987) (citation omitted). But this court exercises independent judgment on purely legal questions. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

## I

Holdings argues that O'Halloran did not have apparent authority to enter into a stock-redemption agreement with Powell. Powell does not dispute that O'Halloran did not have express authority to enter into such an agreement.

■■■■ A principal is bound not only by an agent's actual authority but also by authority that the principal has apparently delegated to the agent. *Duluth Herald & News Tribune v. Plymouth Optical Co.,* 286 Minn. 495, 498, 176 N.W.2d 552, 555 (1970). Apparent authority is authority a principal "holds an agent out as possessing, or knowingly permits an agent to assume." *Foley v. Allard,* 427 N.W.2d 647, 652 (Minn.1988). To find apparent authority, (1) "the principal must have held the agent out as having authority, or must have knowingly permitted the agent to act on its behalf," (2) third parties "must have [had] actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf," and (3) "proof of the agent's apparent authority must be found in the conduct of the principal, not the agent." *Hockemeyer v. Pooler,* 268 Minn. 551, 562, 130 N.W.2d 367, 375 (1964); Restatement (Second) of Agency § 8 (1958).

■■■■ Whether an agent is clothed with apparent authority is a question of fact. *Hagedorn v. Aid Ass'n for Lutherans,* 297 Minn. 253, 257, 211 N.W.2d 154, 157 (1973). In determining whether apparent authority exists, the court may consider any statements, conduct, lack of ordinary care, or manifestations of the principal's consent, such that a third party might be justified in concluding that the agent acted with apparent authority. *McGee v. Breezy Point Estates,* 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969); Restatement (Second) of Agency § 27 (1958) (describing creation of apparent authority).

■■■■ The district court found that O'Halloran had apparent authority to enter into a stock-redemption agreement

with Powell. Holdings can be held to O'Halloran's agreement only if Powell's belief that O'Halloran had authority to make that agreement is reasonable and traceable to Holdings. *See Hockemeyer*, 268 Minn. at 562, 130 N.W.2d at 375. But because corporate presidents generally control and supervise a corporation's business, unless there is contrary evidence, contracts made by a corporation's president in the ordinary course of business are presumed to be within the president's authority. 2A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 559 (perm.ed., rev.vol.1992); *see also Foley v. Wabasha–Nelson Bridge Co.*, 207 Minn. 399, 401, 291 N.W. 903, 905 (1940) (quoting with approval earlier version of the treatise). Holdings argues that the stock-redemption agreement was so extraordinary that, as a matter of law, Powell could not reasonably have believed that O'Halloran was authorized to agree to it. The evidence, however, does not support this argument.

 Whether a contract is in "the ordinary course of business" is, in most instances, part of the fact-specific inquiry of whether apparent authority exists. *Lee v. Jenkins Bros.*, 268 F.2d 357, 370 (2d Cir.1959) (surveying cases deciding what is or is not an extraordinary contract and concluding that except in certain limited circumstances the inquiry is the same factual inquiry as whether apparent authority exists). *See also* Restatement, *supra*, § 27 cmt. a ("[A]pparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties * * *."). The factual inquiry depends on a number of factors, including the nature of the contract, the officer negotiating it, and the corporation's usual manner of conducting business. *Id.* at 369 (finding that corporation president's prom-

ise to pay pension to newly hired manager was not extraordinary); *see also Foley*, 207 Minn. at 403–04, 291 N.W. at 905–06 (finding that corporate president's contract modification to allow agent to collect a salary was not in corporation's ordinary course of business).

A number of facts support a determination that the contract between O'Halloran and Powell was not extraordinary. Just six months earlier, in August 1996, Holdings had redeemed other shareholders' stock for the same price O'Halloran offered Powell. At the time of the 1996 recapitalization, with board approval, O'Halloran signed the shareholders' agreement on behalf of Holdings, agreeing to buy the shares of the departing shareholders for $125.456 a share, the same amount O'Halloran offered to Powell. Powell could have reasonably believed that if O'Halloran had the authority to agree on behalf of Holdings to buy stock in August 1996, he had similar authority in January 1997. *See Temple, Brissman & Co. v. Greater St. Paul Corp.*, 189 Minn. 236, 237, 248 N.W. 819, 819 (1933) (holding that corporate president was clothed in apparent authority to bind corporation to pay for corporate audit because corporation had previously paid for two other audits).

Holdings also alleges that the district court based its apparent-authority finding solely on O'Halloran's position as Holdings' president, CEO, and member of its board of directors and that proof of O'Halloran's authority cannot be found in his title without some other manifestation of authority traceable to Holdings. To make its point, Holdings cites cases standing for the proposition that an agent's position alone is not sufficient evidence of apparent authority to bind the corporation to obligations incurred by that agent. *See, e.g., Thompson v. North Star Muskrat Farm, Inc.*, 183 Minn. 314, 315–16, 236 N.W. 461, 462

(1931) (finding no apparent authority for corporate vice-president to enter into agreement with real-estate broker when vice-president made agreement without board authorization); *Bloomingdale v. Cushman,* 134 Minn. 445, 450, 159 N.W. 1078, 1080 (1916) (finding no apparent authority when president signed bank notes without board authorization).

Although a job title alone will not conclusively establish apparent authority for a contract, Powell's belief that O'Halloran was authorized to redeem Powell's stock is traceable, in part, to O'Halloran's position as Holdings' top-ranking executive. *See Frank Sullivan Co. v. Midwest Sheet Metal Works,* 335 F.2d 33, 40–41 (8th Cir.1964) (finding that superintendent had apparent authority to bind contractor because superintendent was highest-ranking person sent to assess construction job and communicate with subcontractor); *Associated Lithographers v. Stay Wood Prods., Inc.,* 279 N.W.2d 787, 790 (Minn.1979) (holding that executive vice-president had apparent authority to bind corporation to printing contract); *Lindstrom v. Minnesota Liquid Fertilizer Co.,* 264 Minn. 485, 497, 119 N.W.2d 855, 863 (1963) (finding that branch manager had apparent authority to bind company to contract because fertilizer company led salesperson to believe that branch manager's position included authority to enter into contract to buy materials).

Because corporations are engaged in many different transactions and because the pace of corporate business is too swift to insist on express approval by a corporation's board of directors for every transaction labeled "unusual," third parties commonly rely on the authority bestowed on corporate officials. *Lee,* 268 F.2d at 366; Note, *Inherent Power as a Base of a Corporate Officer's Authority to Contract,* 57 Colum. L.Rev. 868, 885 (1957) (describing courts' "increasing tendency" to vest a corporate president with broad apparent authority to bind the corporation to contracts executed by that president). In fact, Holdings' officers' conduct after Powell left its employ demonstrates additional unapproved action and illustrates the way in which Holdings conducted its business. In February and March 1997, Holdings' in-house counsel made two separate proposals to Powell to buy Powell's stock, despite not having prior board approval for those proposals.

Further illustrating the importance of an agent's corporate position as a manifestation of the principal's consent to the agent's actions, the tentative draft of the third restatement of agency partially defines apparent authority based on an agent's position:

> When an agent holds a position within an organization, or has been placed in charge of a transaction or situation, a third party acts reasonably in believing that the agent has authority to do acts consistent with the position the agent occupies absent knowledge of circumstances that would lead a reasonable third party to inquire into the existence, extent or nature of the agent's authority.

Restatement (Third) of Agency § 2.03 (Tentative Draft No. 1, 2000).

It is significant that O'Halloran's appearance of authority resulted from Holdings' conduct. Holdings placed O'Halloran in the position to ask Powell to resign or to be fired and to offer Powell a severance package. Holdings also invested authority in O'Halloran to buy shares from the retiring shareholders at the time of the recapitalization, leading to Powell's reasonable belief that O'Halloran had authority to buy Powell's stock as well.

Holdings points out that in the face of evidence raising questions as to the agent's authority, third parties dealing with agents

are put on inquiry and must discover whether the agent has the authority to complete the proposed act. *See Truck Crane Serv. Co. v. Barr–Nelson,* 329 N.W.2d 824, 827 (Minn.1983). Holdings contends that Powell was on notice that O'Halloran lacked authority because at the time of the recapitalization he had entered into a stockholders' agreement specifying that Holdings could not repurchase securities without the approval of a majority of the board of directors and three Investors' directors. But even accepting that Powell knew O'Halloran needed board and Investors' approval to agree to buy the stock, it is unclear what Powell could have done to ascertain whether O'Halloran had the necessary approval. Both O'Halloran and Holdings' in-house counsel testified that Holdings' board acted informally and secretly, generally preparing board resolutions only when a third party such as the IRS required them. In fact, although O'Halloran testified that Holdings' board had approved the decision to terminate Powell, there are no corporate minutes reflecting this decision. Had Powell looked to the board for a writing confirming the stock-redemption agreement, he would likely not have found one even if the board did agree to redeem Powell's stock.

The district court did not err in concluding that O'Halloran had apparent authority to enter into a stock-redemption agreement.

## II

■■■ Holdings asserts that whether or not O'Halloran had apparent authority, the evidence is insufficient to support the district court's finding that O'Halloran agreed to buy the stock from Powell. "If in dispute, the existence and terms of a contract are questions for the fact finder." *Morrisette v. Harrison Int'l Corp.,* 486 N.W.2d 424, 427 (Minn.1992) (citation

omitted). An appellate court has limited review over findings of fact, and those findings may only be overturned if manifestly contrary to the evidence. *Id.; Greer v. Kooiker,* 312 Minn. 499, 507, 253 N.W.2d 133, 139–40 (1977) (upholding district court finding of oral contract because finding was not clearly erroneous).

■■■ Whether a contract has been formed is judged objectively by the parties' conduct, not by the parties' subjective intent. *Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). The court must determine not what the parties really meant, but what words and actions justified the other party to assume what was meant. *Crince v. Kulzer,* 498 N.W.2d 55, 57 (Minn.App. 1993). In determining whether a contract was formed, this court may look behind words to "consider the surrounding facts and circumstances in the context of the entire transaction, including the purpose, subject matter and nature of it." *Capital Warehouse Co. v. McGill–Warner–Farnham Co.,* 276 Minn. 108, 114, 149 N.W.2d 31, 35 (1967).

The district court found that a contract had been formed between Powell and Holdings and that Holdings had breached the contract. The court's findings specifically took into account its determinations on credibility, stating that

> [t]he Court has had the opportunity to be in the unique position to observe the witnesses and weigh their credibility. The Court has considered their relationship to the parties, their interest or lack of interest in the outcome of the case, their age, experience, manner and appearance, their ability and opportunity to know, remember and relate facts, their frankness and sincerity, or lack thereof, and the reasonableness of their testimony in light of all the other evidence in the case.

The court went on to state that "[t]he critical issue for the Court's consideration was the credibility of Powell and O'Halloran as to what was said at the January 23, 1997 meeting, how it was said, and what was meant. This credibility judgment was pivotal in the Court's decision-making." The court specifically discredited O'Halloran's testimony, stating in a memorandum attached to an order amending its findings that it did not find O'Halloran's testimony to be credible and did not accept his version of the events.

The record contains ample evidence supporting the district court's determination that O'Halloran offered, on behalf of Holdings, to redeem Powell's stock and that Powell agreed to that redemption. The strongest evidence pointing to a contract between Holdings and Powell is the chart and letter O'Halloran prepared for the January 23 meeting. The handwritten chart depicts Powell's shares on that date: 24,793 shares pledged as collateral for Powell's loan and another 34,402 shares labeled "non-optioned/non-restricted." The chart shows 16,590 of Powell's shares redeemed for cash at the same sum that was paid the retiring shareholders, $125.456, for a total sum of $2,081,315. The chart also depicts Powell's remaining "non-optioned/non-restricted" 17,812 shares being redeemed for preferred B stock, at a value of $2,234,622. This amount of money is identical to what Powell would have been paid had he sold his shares after Holdings' 1996 recapitalization.

While Holdings maintains that the chart was meant as a "draft" for O'Halloran's use only and points out that the word "draft" is written on the top of the chart, O'Halloran's act of giving a copy of the chart to Powell and later directing Holdings's human-resources director to type the chart and give Powell the typed version of the chart belies that argument.

Equally damaging to Holdings's claim that the two men made no agreement is O'Halloran's "termination" letter to Powell, prepared in case Powell refused to resign and O'Halloran was forced to fire him. O'Halloran wrote Powell that "[w]hile there is never a desirable time for a decision like this, I do feel that the recent investment and redemption process provide both a model and a means for this separation to occur in a very fair and enriching way." He went on to state that "as part of the separation and release process, I have arranged for the Company to redeem your non-optioned and nonrestricted stock for cash and securities in the same proportions to that received by other redeeming shareholders in August."

Other evidence tends to prove that O'Halloran, on behalf of Holdings, agreed to redeem Powell's stock at the January 23, 1997, meeting. O'Halloran prepared an agenda for the meeting, listing "Stock redemption" as an agenda item. Powell took notes at the meeting, and his notes corroborate O'Halloran's agenda, listing discussed items in the same order and stating "cash ☞ pref. B for remaining stock."

Further, at trial, Powell entered into evidence a document provided by Holdings's bank stating, "[a]n additional $2.6 [million] will be left in MVE Holdings account which will be potentially utilized to repurchase Ed Powell's stock. The Ed Powell transaction will be completed by August * * *. The stock would then be available for key officers and/or the Investor group to purchase."

In February and March 1997, while negotiating Powell's separation agreement, Holdings offered to buy a portion of Powell's stock at the same price that Powell alleged it had agreed to buy all the stock—

$125.456—and also offered to attempt to arrange for the repurchase of the rest of the stock. In the February offer letter to Powell, Holdings' counsel stated that Holdings would attempt to arrange the sale of the stock by August 31, 1997, and stated, "we are confident we would be able to achieve this goal." In June, O'Halloran sent a letter soliciting Holdings' officers to buy Powell's stock. These communications evidence Holdings' officers' belief that Holdings had agreed to buy Powell's stock in January 1997.

Also, Powell's attorney sent a conflict-of-interest waiver to Holdings on January 23, 1997, stating that "[Holdings] hereby waives any and all conflicts that may exist should [attorney] represent Ralph E. Powell in connection with the sale of his company stock * * *." Holdings' counsel signed and returned the waiver, apparently not disavowing the waiver's purpose, the sale of Powell's stock. Further, Powell's attorney testified that during a telephone conference with O'Halloran and Holdings' counsel in March 1997, he asked whether Holdings intended to redeem Powell's stock, and O'Halloran purportedly stated, "We are going to buy the stock. We just don't want to put it in writing."

To show that O'Halloran and Powell did not agree that Holdings would buy Powell's stock, Holdings points out that the stock-redemption agreement is not part of the proposed separation agreement O'Halloran gave Powell at the January meeting, Powell kept the stock-redemption agreement secret until late February or early March, and in his letter of resignation written after the January 23 meeting, Powell asked Holdings to buy his stock.

But Powell satisfactorily explains these facts, stating that the separation agreement was distinct from the stock-redemption agreement and that O'Halloran wanted the latter agreement to remain confidential. According to Powell, O'Halloran wanted the stock agreement and Powell's termination to be private to avoid setting a "bad precedent." Also, Powell states that he asked Holdings to buy back his stock in his resignation letter at O'Halloran's request and styled the letter "taking words and concepts off of Mr. O'Halloran's letter."

The evidence, therefore, supports the district court's finding that O'Halloran agreed to buy Powell's stock.

### III

▇ Holdings also challenges the validity and enforceability of the contract on three grounds. First, Holdings asserts that the agreement between Powell and O'Halloran was not a final, written expression, but only evidence of continued negotiations between the parties.

▇ A signed agreement is not required for formation of a contract. *Aratex Servs. Inc. v. Blue Horse, Inc.*, 497 N.W.2d 283, 285 (Minn.App.1993), *review denied* (Minn. May 11, 1993). But "where the parties know that the execution of a written contract was a condition precedent to their being bound, there can be no binding contract until the written agreement was executed." *Dataserv Equip., Inc. v. Technology Fin. Leasing Corp.*, 364 N.W.2d 838, 841 (Minn.App.1985), (finding no contract after one party rejected the other's counteroffer), *review denied* (Minn. May 31, 1985) (citation omitted).

The record contains no evidence, however, that O'Halloran and Powell intended to impose a condition precedent requiring a written contract. *See Asbestos Prod., Inc. v. Healy Mechanical Contractors, Inc.*, 306 Minn. 74, 78, 235 N.W.2d 807, 809 (1975) (finding no condition precedent to reduce contract to a writing when parties have assented to all the essential terms of the

contract). Thus, in the absence of evidence to the contrary, the agreement between Powell and O'Halloran was not a preliminary negotiation but, rather, the parties' final agreement.

 Holdings alternatively argues that any agreement between Powell and Holdings is void because Powell did not furnish adequate consideration. When a contract is not supported by consideration, no valid contract is formed. *Franklin v. Carpenter,* 309 Minn. 419, 422, 244 N.W.2d 492, 495 (1976). Consideration is "something of value given in return for a performance or promise of performance," *Deli v. Hasselmo,* 542 N.W.2d 649, 656 (Minn. App.1996), *review denied* (Minn. Apr. 16, 1996), and requires that a contractual promise be the product of a bargain. *Baehr v. Penn-O-Tex Oil Corp.,* 258 Minn. 533, 538, 104 N.W.2d 661, 665 (1960). The determination of whether sufficient consideration underlies an agreement raises a question of law, which this court reviews de novo. *Brooksbank v. Anderson,* 586 N.W.2d 789, 794 (Minn.App.1998), *review denied* (Minn. Jan. 27, 1999).

Powell asserts and O'Halloran concedes that, in exchange for the stock redemption, O'Halloran asked him to continue, even after he left CAIRE, to participate as a member of several trade-association boards, to attend trade-association meetings, and to lobby Congress on behalf of Holdings. Additionally, Powell and O'Halloran testified that to disrupt CAIRE's business as little as possible and because of his belief that customer goodwill might be affected if customers felt that Powell was fired, O'Halloran asked Powell to contact CAIRE's key customers and industry contacts to reassure them that Powell's departure was a positive, voluntary step. Powell performed these functions until April 1997, when O'Halloran wrote a letter requesting that Powell no longer make those efforts and telling Powell that Holdings would no longer pay him or offer reimbursement for any incurred expenses.

 Holdings asserts that Powell's lobbying activities were not performed as consideration for stock redemption but, instead, for a cash bonus tied to those efforts and that the other tasks Powell claims to have performed were of no value to Holdings. But even if Powell's lobbying efforts are discounted, he performed other tasks for Holdings at Holdings' request. Also, a court will not examine the adequacy of consideration so long as something of value has passed between the parties. *Brooksbank,* 586 N.W.2d at 794; *see also Cederstrand,* 263 Minn. at 531, 117 N.W.2d at 220 ("[B]argain does not mean an exchange of things of equivalent, or any value."). Although the consideration that Powell furnished may not have been as significant as the benefits that Holdings promised to confer, Powell provided adequate consideration, and the agreement between Powell and Holdings is not void for lack of consideration.

 Relying on *Berreman v. West Publ'g Co.,* 615 N.W.2d 362 (Minn.App. 2000), *review denied* (Minn. Sept. 26, 2000), Holdings also claims that the oral agreement between Holdings and Powell is against public policy because the agreement prefers Powell as a shareholder at the expense of the other shareholders. In *Berreman,* this court discussed the "equal-opportunity rule" found in *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505, 518 (1975), which forces a closely held corporation buying shares from one shareholder to offer to buy shares from other shareholders at an identical price. *Berreman,* 615 N.W.2d at 370. Holdings contends that under *Berreman,* this court must find that O'Halloran breached his fiduciary duty to the remaining Holdings' shareholders when he of-

fered to buy Powell's shares for more than Holdings was willing to pay other shareholders and, because of that breach of fiduciary duty, the agreement is void as against public policy.

■▬▬ But Holdings' argument is unpersuasive in this context. The "equal-opportunity rule" is designed to protect minority shareholders from being "frozen out." *Id.* In making this argument, Holdings ignores the fact that if this court applied the rule to the facts in the case, it would not be protecting a minority shareholder. Further, buying one shareholder's shares at a premium could reasonably be founded on a valid business judgment. *See id.* (recognizing that the Massachusetts Supreme Court later retreated from the *Donahue* holding in *Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 353 N.E.2d 657, 663 (1976), because legitimate business reasons may exist for treating different shareholders differently).

Because the district court did not err in finding a contract between Holdings and Powell, we need not address the district court's finding that, in the alternative, Holdings was bound to Powell by virtue of promissory estoppel.

## IV

■▬▬ Finally, Holdings claims that it is entitled to a new trial because the district court's findings are manifestly contrary to the evidence. Ordinarily, a decision to grant a new trial rests within the sound discretion of the district court and will not be disturbed absent a clear abuse of that discretion. *Halla Nursery, Inc. v. Baumann–Furrie & Co.,* 454 N.W.2d 905, 910 (Minn.1990). "On appeal from a denial of a motion for a new trial, the verdict must stand unless it is manifestly and palpably contrary to the evidence, viewed in the light most favorable to the verdict." *ZumBerge v. Northern States Power Co.,*

481 N.W.2d 103, 110 (Minn.App.1992) (citation omitted), *review denied* (Minn. Apr. 29, 1992). The district court's decision was not so manifestly and palpably contrary to the evidence as to require a new trial.

## DECISION

The district court did not err in finding that O'Halloran had apparent authority to enter into a contract with Powell and that the parties formed a valid contract supported by consideration, not in violation of public policy, and not subject to a condition precedent requiring the agreement to be in writing.

**Affirmed.**